IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JESETTE G., ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KILOLO KIJAKAZI, Acting ) <br> Commissioner of Social Security, ) <br> ) <br>     Defendant. ) | Case No. 21-cv-00379-SH |

**OPINION AND ORDER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jesette G. requests judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, 1381-1383f. In accordance with 28 U.S.C. § 636(c), the parties have consented to proceed before a United States Magistrate Judge. For the reasons explained below, the Court **AFFIRMS** the Commissioner's decision denying benefits.

**I.    Disability Determination and Standard of Review**

Under the Act, a "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 1382c(a)(3)(A) (regarding disabled individuals). The impairment(s) must be "of such severity that [the claimant] is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations implement a five-step sequential process to evaluate disability claims. 20 C.F.R. § 404.1520.[1] "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). Under the five-step process, the Commissioner inquires into: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe medically determinable impairment(s); (3) whether the impairment meets or equals a listed impairment from 20 C.F.R. pt. 404, subpt. P, app. 1; (4) considering the Commissioner's assessment of the claimant's residual functional capacity ("RFC"), whether the claimant can still do her past relevant work; and (5) considering the RFC and other factors, whether the claimant can perform other work. *Id.* § 404.1520(a)(4)(i)-(v). Generally, the claimant bears the burden of proof for the first four steps. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). At the fifth step, the burden shifts to the Commissioner to provide evidence that other work the claimant can do exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2).[2]

Judicial review of the Commissioner's final decision is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. *See Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The "threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It is more than a scintilla but means only "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] *See generally* 20 C.F.R. § 416.920 for Title XVI. (Where possible, the body of this opinion will reference the Title II regulation and provide, the first time mentioned, a parallel citation for Title XVI.)

[2] *See generally* 20 C.F.R. § 416.960 for Title XVI.

conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met," *Grogan*, 399 F.3d at 1262, but it will neither reweigh the evidence nor substitute its judgment for that of the Commissioner, *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).  Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence.  *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## II.  Background and Procedural History

In October 2018, Plaintiff applied for Title II and Title XVI disability benefits.  (R. 15, 394-403.)  Plaintiff alleges that she has been unable to work since September 1, 2017, due to back issues, stage 3 breast cancer, asthma, and joint pain.  (R. 394, 400, 450.)  Plaintiff was 41 years old on the date of the ALJ's decision.  (R. 34, 394, 400.)  She has a high school equivalent education and past relevant work as a babysitter and salesclerk.  (R. 55-56, 451.)

Plaintiff's claims for benefits were denied initially and on reconsideration, and she requested a hearing.  (R. 136-201, 223-24.)  ALJ Christopher Hunt conducted two substantive hearings and issued a decision finding Plaintiff not disabled.  (R. 15-34, 42-58, 73-104.) The Appeals Council denied review on August 9, 2021 (R. 1-6), rendering the Commissioner's decision final.  20 C.F.R. § 404.981.[3]  Plaintiff timely filed this appeal on September 14, 2021.  (ECF No. 2.)  *See* 20 C.F.R. § 422.210(c).

---

[3] 20 C.F.R. § 416.1481 for Title XVI.

### III. The ALJ's Decision

In his decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 1, 2017. (R. 18.) At step two, the ALJ found Plaintiff had numerous severe impairments, including obesity, peripheral neuropathy, seronegative arthritis, fibromyalgia, and bilateral carpal tunnel syndrome. (*Id.*) At step three, the ALJ found Plaintiff's impairments did not meet or equal a listed impairment. (R. 19-24.)

The ALJ then determined Plaintiff had the RFC to perform light work with several physical and mental limitations. As relevant to this appeal, these included that Plaintiff could "occasionally reach or work overhead" and could "frequently grasp, handle, and perform fine motor manipulation." (R. 24.) The ALJ provided a summary of the evidence that went into this finding. (R. 24-32.)

At step four, the ALJ concluded that Plaintiff could not return to her past relevant work. (R. 32.) Based on the testimony of a vocational expert ("VE"), however, the ALJ found at step five that Plaintiff could perform other occupations existing in significant numbers in the national economy, including small product assembler, inspector packer, and office helper. (R. 33-34.) The ALJ thus found Plaintiff was not disabled. (R. 34.)

### IV. Issues

Plaintiff raises two points of error: (1) the ALJ developed an RFC that contradicted the record;[4] and (2) the ALJ failed to resolve a conflict between the VE's testimony and

---

[4] Plaintiff's specific RFC-related arguments include that the ALJ inadequately explained how the medical and non-medical evidence supports the manipulative limitations in the RFC assessment (ECF No. 21 at 4-11); the ALJ inadequately developed the record regarding the manipulative limitations caused by Plaintiff's peripheral neuropathy and carpal tunnel syndrome (*id.* at 8-9, 12); and the ALJ established the RFC based on his own interpretation of the evidence rather than a medical opinion (*id.* at 8-9).

the reaching requirement identified by the Dictionary of Occupational Titles ("DOT") for the jobs identified at step five. (*Id.* at 12-15.)

## V. Analysis

Plaintiff's listed errors primarily relate to the ALJ's treatment of her peripheral neuropathy/carpal tunnel syndrome.[5] As such, the Court will first address the evidence relating to these impairments before turning to Plaintiff's arguments.

### A. Evidence Related to Plaintiff's Peripheral Neuropathy

The record indicates Plaintiff regularly reported bilateral wrist/hand numbness to providers at Alternative Medicine of Tulsa ("AMT") between March 2017 and February 2018, and such providers consistently noted "+ carpel tunel [sic]" in her upper extremities at these appointments. (R. 873-93.) Although Plaintiff did not report wrist/hand numbness after February 2018, AMT providers continued treating her for other issues through August 2018. (R. 850-71.) On physical examinations throughout their course of treatment, Plaintiff's AMT providers consistently found full strength in her upper extremities and either intact sensation to light touch symmetrically or full range of motion. (R. 850-93.) Plaintiff also consistently denied extremity weakness or change in sensation. (*Id.*)

Plaintiff established care with Dr. Chelsea Thomas on September 6, 2018, as a new breast cancer patient. (R. 567.) At this initial appointment, Plaintiff reported, *inter alia*,

---

[5] Carpal tunnel syndrome is a type of peripheral neuropathy. *See Carpal Tunnel Syndrome,* University of Chicago Center For Peripheral Neuropathy, https://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/compression/carpaltunnel.shtml (last visited February 7, 2023) (describing carpal tunnel syndrome as "a localized peripheral neuropathy that affects the hands"). Because Plaintiff's RFC-related errors are restricted to the ALJ's consideration of her manipulative limitations, the Court will treat the terms "peripheral neuropathy" and "carpal tunnel syndrome" as synonymous for purposes of this opinion.

5

numbness and tingling in her hands "at times." (*Id.*) Dr. Thomas diagnosed Plaintiff with idiopathic peripheral neuropathy and indicated she would modify Plaintiff's chemotherapy medication if her current medication worsened her neuropathy. (R. 571.) Thereafter, Dr. Thomas indicated Plaintiff's neuropathy was stable through November 2018. (R. 590, 597, 632, 639.) Plaintiff denied numbness or tingling in her hands at a follow-up appointment with Dr. Thomas on November 30, 2018. (R. 635.) However, on December 21, 2018, Plaintiff reported new and intermittent peripheral neuropathy in her fingers, but no difficulty with hand function. (R. 927.) Dr. Thomas diagnosed Plaintiff with peripheral neuropathy secondary to chemotherapy, noting Plaintiff's numbness comes and goes and causes no limit in function. (R. 931.) The following month, Plaintiff reported her peripheral neuropathy was constant but still did not cause functional difficulty with her hands, and Dr. Thomas reduced Plaintiff's chemotherapy dose due to her worsening neuropathy. (R. 939, 943.) On January 17, 2019, Dr. Thomas cancelled further chemotherapy for issues unrelated to Plaintiff's neuropathy. (R. 951.)

Dr. Lucas Meyers performed a consultative physical examination of Plaintiff on March 4, 2019. (R. 1102-07.) As to Plaintiff's hands, Dr. Meyers found sensory loss in Plaintiff's first three fingers but no thenar muscle atrophy; full grip strength bilaterally; full range of motion in her wrists and fingers; and normal fine tactile manipulation of objects, noting Plaintiff was able to pick up and manipulate paperclips without difficulty. (R. 1103, 1106.) Dr. Meyers opined Plaintiff could effectively oppose her thumb to her fingertips, manipulate small objects, and effectively grasp tools such as a hammer. (R. 1106.)

Dr. Jeff Halsell performed an ulnar nerve conduction study and an electromyography ("EMG") on July 9, 2019. (R. 1469.) He concluded there was

6

"electrodiagnostic evidence of a large fiber peripheral neuropathy" which affected the sensory and motor nerves in Plaintiff's bilateral upper extremities in a mixed pattern. (*Id.*)  Dr. Halsell's physical examination that day revealed full strength and intact sensation to light touch in Plaintiff's extremities. (*Id.*)

Plaintiff established care with nurse practitioner Anita Williams on July 27, 2019, for an annual wellness exam and for orthopedic, sleep study, and neurology referrals. (R. 1161, 1164.) Plaintiff reported, *inter alia,* a history of neuropathy and generalized pain and tingling in her skin since 2018. (R. 1164.)  On physical exam, Ms. Williams found Plaintiff had normal strength and tone in her joints, bones, and muscles as well as intact sensation. (R. 1165.) She referred Plaintiff to neurology for evaluation and treatment of idiopathic peripheral autonomic neuropathy. (*Id.*)

Plaintiff presented to Dr. Desiree Ortiz-Cruz, a neurologist, on October 7, 2019. (R. 1208.) Plaintiff reported experiencing abnormal sensation, cramping, and pain in her extremities for ten years. (*Id.*) Dr. Ortiz-Cruz found full strength, "patchy" decreased sensation, and tenderness to touch in Plaintiff's extremities. (R. 1209.)  She also found no evidence of dysmetria or tremors in Plaintiff's upper extremities but did note a positive Tinel's sign test in Plaintiff's wrists. (*Id.*) Dr. Ortiz-Cruz assessed Plaintiff with bilateral carpal tunnel syndrome and recommended wrist drop splints at night. (*Id.*) Dr. Ortiz-Cruz made similar findings on November 18, 2019, and she referred Plaintiff to a rheumatologist based on lab results which were suggestive of a connective tissue disorder. (R. 1205-06.)

Plaintiff established care with Dr. Basmah Jalil, a rheumatologist, on January 31, 2020.[6] (R. 1538.) Plaintiff did not report any hand or wrist pain or numbness at this initial appointment, but she did report pain in her hands and wrists at a follow-up appointment in February 2020, and she reported numbness and tingling in her hands at follow-up appointments in May and October 2020. (R. 1538-39, 1552, 1598.) Dr. Jalil treated Plaintiff with medication for seronegative arthritis, fibromyalgia, and/or peripheral neuropathy between February 2020 and October 2020. (R. 1538-1627.) At these appointments, Dr. Jalil consistently found tenderness in Plaintiff's fingers and/or wrists, with normal range of motion and no focal deficits. (R. 1555-56, 1573, 1585, 1601.) By August 2020, Plaintiff indicated her joint pain medication "helped her tremendously." (R. 1582.) Similarly, at a follow-up appointment on October 7, 2020, Plaintiff reported her anti-inflammatory medication improved the swelling and stiffness in her hands, but she continued to have numbness and tingling. (R. 1597-98.)

At the October 2020 administrative hearing, Plaintiff testified that she experiences numbness in her hands and feet and has been diagnosed with "carpal tunnel and neuropathy." (R. 88, 90.) Because there was uncertainty about whether Plaintiff had undergone an EMG or not, the ALJ provided her an additional ten days to supplement the record with any EMG results.[7] (R. 88-92, 101-03.) Based on the VE's responses to several hypothetical questions, the ALJ indicated the disability decision in this case turned on whether Plaintiff could frequently versus occasionally grasp, handle, and

---

[6] The ALJ refers to this physician as Dr. Basmah.

[7] Plaintiff submitted additional evidence after the initial hearing but before the supplemental hearing. *Compare* R. 81 (indicating the record contains exhibits B1F through B25F) *with* R. 47 (indicating the record contains exhibits B1F through B31F). This additional evidence includes the July 2019 EMG results. (R. 1469.)

perform fine motor manipulation, making the EMG results, if any, even more important. (R. 101.) Plaintiff's counsel inquired about scheduling a consultative examination in the event Plaintiff did not undergo an EMG, to which the ALJ replied "normally I would grant you the request for a C.E., but as of right now, we're not doing in-person C.E.'s." (*Id.*)

At the February 2021 supplemental hearing, the ALJ received testimony from Dr. Albert Oguejiofor, a reviewing medical expert who opined as to various work-related limitations he deemed justified in this case. (R. 42-55.) As relevant to this appeal, Dr. Oguejiofor testified that Plaintiff did not have any limitations on her ability to grasp, handle, or perform fine motor manipulation. (R. 48.) In reaching this conclusion, Dr. Oguejiofor specifically considered, *inter alia,* the July 2019 EMG (Exhibit B26F) and Dr. Jalil's treatment notes (Exhibit B29F). (R. 49.) Dr. Oguejiofor explained there was some evidence of peripheral nerve disease but clarified there was no evidence Plaintiff had loss of brain control/central nervous system involvement or myopathy/muscle disease and that Plaintiff's peripheral neuropathy was "really secondary" to her breast cancer treatment. (R. 52-53.) He further explained that decreased sensations and a carpal tunnel diagnosis do not mean Plaintiff has loss of sensation or an inability to feel "hot objects."[8] (R. 49.) When asked whether decreased sensations would affect Plaintiff's ability to move objects such as paperclips or coins, Dr. Oguejiofor stated it was "possible" but indicated the record did not support damage to that degree. (*Id.*)

---

[8] The transcript from the supplemental hearing indicates Dr. Oguejiofor stated Plaintiff has "increased sensations." (R. 49.) Based on context, this appears to be a scrivener's error.

> **B.     The ALJ Did Not Err in Forming the RFC**
>
> **1.     The ALJ considered the relevant evidence and provided a sufficient narrative discussion.**

Plaintiff asserts the ALJ violated Social Security Ruling ("SSR") 96-8p by failing to explain how the medical and non-medical evidence supports his determination that Plaintiff could frequently grasp, handle, and perform fine motor manipulation. (ECF No. 21 at 4-8.)

A claimant's RFC is her "*maximum* remaining ability to do sustained work activities in an ordinary work setting" for 8 hours a day, 5 days per week, despite her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). In assessing the RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion" as to the claimant's work-related limitations. *Id*. at *7. In other words, the ALJ must explain the basis for the limitations included in the RFC, with citations to "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. Additionally, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence" of record were considered and resolved. *Id*. Furthermore, if the RFC conflicts with a medical source opinion, the ALJ must "explain why the opinion was not adopted." *Id*.

The ALJ's decision satisfies these narrative requirements. In assessing Plaintiff's manipulative limitations, the ALJ thoroughly discussed Plaintiff's testimony and the findings of her treating, consultative, and reviewing physicians related to her peripheral neuropathy. (R. 25-29.) Specifically, the ALJ noted Dr. Meyers' normal consultative examination findings (R. 27); the July 2019 EMG (*id*.); Dr. Ortiz-Cruz's findings of "patchy decreased sensation and tenderness" in Plaintiff's extremities and positive Tinel's signs in her wrists (R. 28); and Dr. Jalil's consistent finding of tenderness in Plaintiff's

fingers and/or wrists, as well as her treatment notes indicating Plaintiff's hand symptoms improved with medication but did not fully resolve (R. 28-29).

As part of his analysis of the medical source opinion evidence, the ALJ considered Dr. Oguejiofor's opinion that Plaintiff did not require any grasping, handling, or fine motor manipulation limitations. (R. 25.) The ALJ found this portion of Dr. Oguejiofor's opinion inconsistent with the July 2019 EMG and with examinations performed by Dr. Ortiz-Cruz and AMT providers showing positive bilateral carpal tunnel signs, all of which the ALJ indicated "certainly require[] manipulative limitations for the upper extremities." (R. 32.) Accordingly, the ALJ limited Plaintiff to frequent grasping, handling, and performing fine motor manipulation. (R. 31.) The ALJ specifically explained the manipulative limitations he identified were due to, *inter alia,* Plaintiff's upper extremity pain and carpal tunnel syndrome. (*Id.*) Notably, the longitudinal evidence in the record does not reflect further limitations. There is no medical source opinion in the record that identifies manipulative limitations greater than those included in the RFC assessment, and the ALJ clearly considered the evidence of record in his decision. !!The Court thus finds the ALJ considered all the evidence related to Plaintiff's peripheral neuropathy and sufficiently explained how such evidence supported the RFC assessment. *See Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) ("The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence."). Nothing more was required. Because Plaintiff points to no evidence the ALJ overlooked, her arguments amount to a request that the Court reweigh the evidence, which it cannot do. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) ("We consider whether the ALJ followed the 'specific rules of law that must be followed in weighing particular types of

evidence in disability cases,' but we will not reweigh the evidence or substitute our judgment for the Commissioner's." (citations omitted)).

### 2. The ALJ sufficiently developed the record.

Plaintiff contends the ALJ failed to fully develop the record as to the manipulative limitations resulting from her peripheral neuropathy. (ECF No. 21 at 8-9, 12.) Specifically, Plaintiff argues remand is required so that Plaintiff may undergo a consultative examination.

Although the burden to prove disability is on the claimant, a social security disability hearing is non-adversarial, and the ALJ must ensure that "an adequate record is developed during the disability hearing consistent with the issues raised." *Branum v. Barnhart,* 385 F.3d 1268, 1271 (10th Cir. 2004) (quoting *Henrie v. U.S. Dep't of Health & Hum. Servs.,* 13 F.3d 359, 360-61 (10th Cir. 1993)). The ALJ's duty is limited to fully and fairly developing the record as to material issues. *Hawkins v. Chater,* 113 F.3d 1162, 1168 (10th Cir. 1997).

Developing the record may involve ordering consultative examinations and testing. To establish the need for a consultative examination, a claimant must "in some fashion raise the issue sought to be developed, which, on its face, must be substantial." *Id.* at 1167 (citations omitted). If a claimant is represented by counsel, "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Id.* If counsel does not request a consultative exam, courts "will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record." *Id.* at 1168.

Consultative examinations may be used to "secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis" where there is "an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision . . . ." 20 C.F.R. § 404.1519a(b).[9] Specific examples of instances where a consultative examination may be required, include:

> (1) The additional evidence needed is not contained in the records of . . . medical sources; (2) The evidence that may have been available from . . . treating or other medical sources cannot be obtained for reasons beyond [the claimant's] control . . .; (3) Highly technical or specialized medical evidence that [the ALJ] need[s] is not available from . . . treating or other medical sources; or (4) There is an indication of a change in [the claimant's] condition that is likely to affect [her] ability to work, but the current severity of [her] impairment is not established.

*Id.; see also Hawkins,* 113 F.3d at 1166 (stating that a consultative examination is often required if there is a direct conflict in the medical evidence or the medical evidence is inconclusive and may be necessary where additional testing is required to explain a diagnosis).

Contrary to Plaintiff's assertion, the ALJ was not required to further develop the record by obtaining an additional consultative examination. First, it appears the ALJ did exactly what Plaintiff now asserts was necessary—sought further opinion evidence from someone who considered the 2019 EMG (ECF No. 21 at 8). As noted above, at the supplemental hearing, the ALJ elicited the opinion of Dr. Albert Oguejiofor, who reviewed exhibits B1F through B31F, which includes the 2019 EMG (*see* R. 1469). (R. 46-47.) Having reviewed the medical evidence, Dr. Oguejiofor offered the opinion that Plaintiff would be limited to light work but would <u>not</u> have any limitation on grasping, handling,

---

[9] 20 C.F.R. § 416.919a(b) for Title XVI.

or fine motor manipulation. (R. 48.) It appears that Plaintiff received the medical opinion she is now requesting; she just does not agree with it.

Second, there was no "inconsistency or insufficiency" for a consultative examination to resolve. *See* 20 C.F.R. § 404.1520b(b)(2)(iii).[10] The ALJ is not required to further develop the record if there is sufficient information for the ALJ to make a disability determination. *Cowan v. Astrue,* 552 F.3d 1182, 1187 (10th Cir. 2008).

As discussed above, the medical evidence of record regarding Plaintiff's peripheral neuropathy includes numerous providers' treatment notes from before and after the alleged onset date (R. 565-642, 850-93, 927-1024, 1161-66, 1205-09, 1538-1627), Dr. Meyers' March 2019 consultative examination and opinion (R. 1102-07), Dr. Halsell's July 2019 EMG (R. 1469), and Dr. Oguejiofor's February 2021 medical expert opinion. (R. 42-58.) As the ALJ correctly noted, although this evidence shows Plaintiff suffers from peripheral neuropathy, it also shows Plaintiff was able to perform fine and gross movements with her upper extremities, "routinely" demonstrated normal motor strength in her upper extremities, and "typically" demonstrated normal sensation in her upper extremities. (R. 20-21.) Plaintiff points to no direct conflict in the medical evidence, inconclusive medical evidence, or additional tests needed to explain her diagnoses. *See Hawkins,* 113 F. 3d at 1166. The ALJ had sufficient evidence to make a disability determination, and the need for a consultative examination is not clearly established in the record.

---

[10] 20 C.F.R. § 416.920b for Title XVI.

### 3. The ALJ did not form his own medical opinion.

Plaintiff contends the ALJ formulated the RFC based on his own interpretation of the evidence. (ECF No. 21 at 7-9.) As support for this contention, Plaintiff suggests that Dr. Oguejiofor's testimony provided "no additional understanding" of her upper extremity functional capacity, because he did not identify any grasping, handling, or fine motor manipulation limitations. (*Id.* at 7.) In essence, Plaintiff argues the RFC is not supported by substantial evidence, because the manipulative limitations the ALJ identified do not coincide with (and are more restrictive than) any medical source opinion.

It is well established that "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). Ultimately, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Howard v. Barnhart,* 379 F.3d 945, 949 (10th Cir. 2004). Here, in the absence of a <u>persuasive</u> medical source opinion regarding Plaintiff's manipulative limitations, the ALJ properly evaluated such limitations based on the record as a whole. *See, e.g., McDonald v. Astrue,* 492 F. App'x 875, 885-86 (10th Cir. 2012) (unpublished) (rejecting Plaintiff's "contention that an ALJ is not competent, in the absence of a medical opinion, to assess the severity of mental symptoms and determine the extent of the limitations that result based on the evidence in the claimant's medical records, her daily activities, and her positive response to medication").[11] Moreover, the ALJ's RFC was more restrictive than every medical source opinion of record, all of which identified no manipulative

---

[11] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

15

limitations. There is no "controlling authority holding that the full adverse force of a medical opinion cannot be moderated favorably" to a claimant. *Chapo,* 682 F.3d at 1288 (rejecting the argument that "an explanation for extending the claimant such a benefit" is required). Indeed, "if a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit." *Id.* Accordingly, the ALJ's incorporation of limitations more favorable to Plaintiff does not show the ALJ "formulated an RFC without explanation" (ECF No. 21 at 7).

### C. There is No Apparent Conflict Between the RFC and the Jobs Identified at Step Five

Because Plaintiff met her burden at step four, the Commissioner had the burden "at step five to show that the claimant retains sufficient RFC . . . to perform work in the national economy, given her age, education, and work experience." *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett,* 395 F.3d at 1171 (alteration omitted)). An ALJ may rely on the testimony of a VE to satisfy the step-five burden and identify jobs that a claimant can perform—so long as all the RFC limitations are reflected in the hypothetical question propounded to the VE. *See Qualls v. Apfel,* 206 F.3d 1368, 1373 (10th Cir. 2000).

Plaintiff asserts the ALJ's findings at step five are not supported by substantial evidence, because the ALJ relied on VE testimony without addressing a conflict between that testimony and the DOT. (ECF No. 21 at 12-15.)

While an ALJ can rely on the VE's expert testimony at step five, this reliance has its limits. The ALJ's duty to develop the record includes questioning the VE about the source of her opinions and any deviations from publications like the DOT. *Haddock v. Apfel,* 196 F.3d 1084, 1091 (10th Cir. 1999). As such, "the ALJ must investigate and elicit

16

a reasonable explanation for any conflict between the [DOT] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Id.*; *see also* SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) ("When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled."). However, not every discrepancy between an expert's testimony and the DOT amounts to an apparent conflict requiring further explanation. *See Segovia v. Astrue,* 226 F. App'x 801, 804 (10th Cir. 2007) (unpublished). "[A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation." *Carey v. Apfel,* 230 F.3d 131, 146 (5th Cir. 2000), *quoted in Segovia,* 226 F. App'x at 804. "For a difference between an expert's testimony and the [DOT's] listings to be fairly characterized as a conflict, it must be obvious or apparent." *Gutierrez v. Colvin,* 844 F.3d 804, 808 (9th Cir. 2016). As such, the ALJ is not required to ask the VE "more specific follow-up questions," where "based on the DOT descriptions, no apparent or obvious conflict existed." *Brown v. Berryhill,* No. 17-cv-00556-GKF-GBC, 2019 WL 2488730, at *6 (N.D. Okla. Mar. 11, 2019).

Before presenting hypotheticals at the supplemental hearing, the ALJ asked the VE, "do you understand that if your testimony differs from the [DOT], you need to advise us of the conflict and the basis of your opinion?" (R. 55.) The VE responded, "Yes, I do." (*Id.*) The ALJ then posed a hypothetical question to the VE that matched the RFC in his decision, and the VE identified three light, unskilled jobs a hypothetical person with the same age, work history, and education as Plaintiff could perform: small product assembler, inspector/packer, and office helper (R. 56-57.) Based on the VE's testimony,

17

the ALJ concluded Plaintiff could perform these jobs and that they existed in significant numbers in the national economy. (R. 33-34.) The ALJ also determined the VE's testimony was consistent with the information contained in the DOT. (R. 34.)

Plaintiff asserts a conflict exits, because the RFC limits her to occasional reaching or working overhead, whereas the alternative jobs the ALJ and VE identified at step five require frequent reaching. DOT § 706.684-022, 1991 WL 679050 (small products assembler); DOT § 559.687-074, 1991 WL 683797 (inspector and hand packager); DOT § 239.567-010, 1991 WL 672232 (office helper). Plaintiff contends the ALJ erred by failing to elicit further testimony from the VE explaining this alleged conflict.

The Tenth Circuit's decision in *Segovia* is instructive.[12] In *Segovia,* the claimant was limited to "occasional overhead reaching," but the VE testified the claimant could perform two jobs that required "frequent reaching" in the DOT. 226 F. App'x at 804. The *Segovia* court looked at the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (the "SCO").[13] Noting the SCO "does not separately classify overhead reaching," the court reasoned that "even a job requiring frequent reaching does not necessarily require more than occasional *overhead* reaching." *Id.* Because the VE was aware of the claimant's overhead reaching limitations, testified that she could perform the jobs he identified, and testified that his opinion was consistent

---

[12] This District has consistently applied *Segovia* in cases with analogous facts. *See, e.g., Kenneth R.C. v. Saul,* No. 19-CV-255-FHM, 2020 WL 3249977, at *2-3 (N.D. Okla. June 16, 2020); *Brown,* 2019 WL 2488730, at *6; *Carolyn Y. v. Berryhill,* No. 17-CV-286-GKF-FHM, 2018 WL 5660752, at *3-4 (N.D. Okla. Sept. 12, 2018); *Kimbrough v. Colvin,* No. 11-CV-676-GKF-TLW, 2013 WL 1015538, at *10-11 (N.D. Okla. March 14, 2013).

[13] The SCO is a companion publication to the DOT. S*ee* SSR 00-4p, at *2 ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy."). It defines "reaching" as "[e]xtending hand(s) and arm(s) in any direction." SCO, App. C.

with the DOT, the court found no apparent conflict between the VE's testimony and the DOT. *Id.* The court explained, "the VE's testimony does not conflict with the *DOT* and *SCO* so much as it clarifies how their broad categorizations apply to this specific case." *Id.* (citing *Carey,* 230 F.3d at 146). After reviewing the DOT descriptions for the identified jobs, the court further found no indication they "predominantly involve overhead reaching rather than other types of reaching." *Id.* The court held the VE's testimony constituted substantial evidence supporting the ALJ's decision to deny benefits. *Id.*

The Court finds *Segovia* persuasive, and, therefore, the same result is warranted in this case. Here, the VE was aware of Plaintiff's overhead reaching limitation, because the ALJ included a limitation of "occasional reaching or working overhead" in the hypothetical he presented to her (R. 56); the VE testified Plaintiff could perform the jobs of small product assembler, inspector/packer, and office helper (R. 56-57); and the VE agreed to identify any conflicts with the DOT but identified none here (R. 55). As in *Segovia,* there is no apparent conflict between the VE's testimony and the DOT, and the ALJ had no obligation to elicit further testimony from the VE. Moreover, the DOT descriptions for the three jobs do not list any duties indicating overhead reaching is involved at all, much less frequent overhead reaching. *See* DOT §§ 706.684-022, 559.687-074, 239.567-010.

There is no apparent conflict between these jobs and the RFC limitation of occasional reaching or working overhead. *Cf. Carrie E.N. v. Saul,* No. 19-cv-126-FHM, 2020 WL 1330433, at *2 (N.D. Okla. Mar. 23, 2020) (finding an apparent conflict between a limitation of "avoid[ing] overhead work," and the tasks performed by a housekeeper cleaner, including "cleaning draperies, walls, ceilings, and replacing light bulbs").

Accordingly, the VE's testimony that Plaintiff could perform the jobs constitutes substantial evidence supporting the ALJ's decision.

## VI.  Conclusion

For the foregoing reasons, the Commissioner's decision finding Plaintiff not disabled is **AFFIRMED.**

**SO ORDERED** this 10th day of February, 2023.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT